**LAKESHORE BROADCASTING, INC., Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee.**

No. 98–1478.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 17, 1999.

Decided Dec. 21, 1999.

Rehearing and Rehearing En Banc Denied March 6, 2000.

---

George R. Borsari, Jr. argued the cause for appellant. With him on the briefs was Anne Thomas Paxson.

Pamela L. Smith, Counsel, Federal Communications Commission, argued the cause for appellee. On the brief were Christopher J. Wright, General Counsel, Daniel M. Armstrong, Associate General Counsel, C. Grey Pash, Jr., and K. Michele Walters, Counsel.

Before: GINSBURG, HENDERSON, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

Lakeshore Broadcasting Corporation appeals an order of the Federal Communications Commission dismissing Lakeshore's application for a construction permit due to its failure to make timely payment of the hearing fee. Pursuant to Commission regulations, the deadline for payment of the hearing fee had been announced in a public notice released only in the Commission's press office in Washington, D.C.

Lakeshore claims that the Commission violated the Communications Act of 1934, the agency's own regulations, and the Due Process Clause of the Fifth Amendment to the Constitution of the United States by dismissing Lakeshore's application for failure to meet a deadline of which Lakeshore was never given personal notice. Lakeshore also challenges as arbitrary and capricious the Commission's denial of Lakeshore's petition for waiver of the deadline and reinstatement of its application.

We affirm the order of the Commission. The dismissal of Lakeshore's application for failure to pay by the deadline does not violate any statutory, regulatory, or constitutional constraint. Because the Commission's policy is lawful, and because Lakeshore has failed to demonstrate that the agency treated its application differently from others similarly situated, the Commission properly denied Lakeshore's petition for waiver and reinstatement.

## I. Background

Under the Communications Act of 1934, the Commission grants an application for a broadcasting license based upon its determination that "the public interest, convenience, and necessity will be served." 47 U.S.C. § 309(a). If the Commission has before it two or more "mutually exclusive" applications—that is, applications of which only one can be granted because they seek the same license or different licenses for broadcasting stations that would interfere with each other—then the Commission must hold a "comparative hearing" to consider the relative merits of the applications. See Ashbacker Radio Corp. v. FCC, 326 U.S. 327, 333, 66 S.Ct. 148, 90 L.Ed. 108 (1945).

The Commission periodically releases a public notice listing applications newly accepted for filing, grouped by station so that it is apparent where there are mutually exclusive applications subject to a comparative hearing. During the period relevant to this litigation, such public notices were released only in the Commission's press office in Washington, D.C.; they were neither mailed to the listed applicants nor published by the Commission in any other form. At some point after release of the public notice, the Commission, as required by statute, "formally designate[s] the application for hearing ... [and] forthwith notif[ies] the applicant." 47 U.S.C. § 309(e). Specifically, the Commission issues a hearing designation order (HDO) giving the time and place of the hearing and setting forth issues to be heard, which it mails to each affected applicant. See 47 C.F.R. § 1.221(a)-(b).

### A. The Hearing Fee Deadline Rule

In 1986 the Congress added § 8 to the Communications Act, 47 U.S.C. § 158, instructing the Commission to assess and collect a substantial fee from each applicant subject to a comparative hearing. See Consolidated Omnibus Budget Reconciliation Act of 1985, Pub.L. No. 99–272, § 5002(e), 100 Stat. 82, 118 (1986) (COBRA). The Commission was authorized to "prescribe appropriate rules and regulations to carry out" the fee program, 47 U.S.C. § 158(f), and to dismiss applications for "failure to pay [the fee] in a timely manner," id. § 158(c)(2).

The Commission first promulgated a rule establishing the deadline for payment of the comparative hearing fee in 1987. At that time, the Commission opined that "[t]he relevant legislative history indicates that [the hearing fee] should be levied when an application is designated for hear-

ing." *See Establishment of a Fee Collection Program,* 2 F.C.C.R. 947, ¶ 138 (1987) (citing H.R. Conf. Rep. No. 99–453, at 427 (1985)). The Commission therefore tied the fee deadline to the formal act of designating an application for hearing: Each applicant was required to pay the hearing fee within 20 days of the Commission's mailing the HDO to that applicant. *See id.* at ¶ ¶ 144, 157. Thus, under the 1987 rule, an applicant whose application had been designated for hearing received personal notice from which the applicant—provided it knew the deadline rule—could determine when the hearing fee was due.

In 1990 the Commission decided to move the time for payment of the hearing fee to an earlier stage in the comparative process; it did so in order to promote earlier settlements by weeding out non-serious applicants and by encouraging the serious ones to settle before the hearing fee was due. *See Proposals to Reform the Commission's Comparative Hearing Process to Expedite the Resolution of Cases, Report and Order,* 6 F.C.C.R. 157, ¶ 4 [*Report & Order*]; *see also* 47 U.S.C. § 158(g) (1990) (setting comparative hearing fee at $6,760 for 1990). The Commission again considered the remark in the conference report on the COBRA linking the hearing fee to formal designation of the application for hearing, but concluded this time that the remark was descriptive rather than prescriptive; the Congress did not intend to limit the Commission's discretion over when to require payment. *See Report & Order,* 6 F.C.C.R. 157, ¶ 6 n. 8. The Commission then adopted its current approach to setting the deadline for payment, under which the deadline is tied to the release of the public notice rather than to formal designation of the application for hearing and the mailing of the HDO:

> In addition to announcing the acceptance of mutually exclusive applications and establishing a date for the filing of petitions to deny such applications, the public notice ... will also announce the date on which all mutually exclusive ap-

plicants will be required to pay the hearing fee.

47 C.F.R. § 73.3573(g)(2)(i). The new rule makes no provision for personal notice to the applicant of the deadline for paying the fee.

The practical effect of the 1990 rule is that once one files an application with the Commission, one must monitor the Commission's public notices in order to determine when one's application has been accepted for filing and whether a mutually exclusive application has been accepted; if so, then there will be a comparative hearing, a hearing fee, and a deadline for paying the fee. If one misses the relevant public notice, then the payment deadline could pass—and one's application be dismissed—before one receives personal notice (in the HDO) that a hearing is necessary.

## B. Lakeshore's Application

On January 19, 1993 Lakeshore applied to the Commission for a permit to construct a new FM broadcast station to operate on channel 229A. On April 9, 1993 the Commission released at its Washington, D.C. press office Public Notice NA–168, reporting the acceptance of five mutually exclusive applications for channel 229A, including Lakeshore's. *See Notice of Acceptance for Filing of FM Broadcast Applications and Notice of Petitions to Deny and Hearing Fee Deadlines,* Mimeo No. 32634. The Public Notice also stated that Lakeshore and its rivals were each required to pay the $6,760 hearing fee "no later than June 11, 1993, or the application will thereafter be dismissed." *Id.*

When June 11 arrived the other four applicants had paid their hearing fees but Lakeshore had failed to do so. By letter dated August 3, 1993 the Commission staff therefore dismissed Lakeshore's application. In response, Lakeshore tendered a check in the amount of the hearing fee, along with a petition requesting reconsideration of the dismissal or waiver of the deadline and reinstatement of its applica-

tion. The staff denied Lakeshore's petition in 1995, and in 1998 the Commission denied Lakeshore's application for review. *See In re Application of Lakeshore Broadcasting, Inc.,* 13 F.C.C.R. 19062.

## II. Analysis

Lakeshore challenges the dismissal of its application, first, on the ground that the 1990 deadline rule violates the Communications Act of 1934 by requiring payment of the hearing fee before an application has been formally designated for hearing. Second, Lakeshore claims the dismissal of its application violates the Commission regulation precluding enforcement of an unpublished requirement against a party that has not received actual notice thereof. Third, Lakeshore argues that the dismissal violates its fifth amendment right to due process, both because Lakeshore was not given personal notice of the deadline and because the published rule does not provide fair notice of what is required of an applicant. In the alternative, Lakeshore challenges as unreasonable and discriminatory the Commission's denial of its petition for waiver of the deadline and reinstatement of its application.

### A. The Communications Act of 1934

As mentioned above, Lakeshore claims that the Commission's deadline rule violates the Communications Act of 1934 because it requires payment of the hearing fee prior to formal designation of the application for hearing. Under § 8 of the Act, as added by the COBRA in 1986, the Commission is required simply to "assess and collect" a charge for a comparative hearing; the time for its payment is not specified. The conference report accompanying the 1986 legislation, however, describes the hearing fee as "[t]he charge levied when an application is designated for hearing." H.R. Conf. Rep. No. 99-453, at 427 (1985). Lakeshore therefore argues that the Congress expressed its intention that the hearing fee not be levied—let alone made payable—before an application is formally designated for hearing.

Because the Congress committed administration of the Act in general, and of § 8 in particular, to the Commission, *see* 47 U.S.C. §§ 154(i) and 158(f), Lakeshore's challenge to the agency's statutory authority is governed by the two-step analysis of *Chevron U.S.A., Inc. v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under *Chevron* step one, we ask "whether Congress has directly spoken to the precise question at issue." *Id.* at 842, 104 S.Ct. 2778. If so, then we "must give effect to the unambiguously expressed intent of Congress." *Id.* at 843, 104 S.Ct. 2778. If not, then under *Chevron* step two we will defer to the agency's interpretation of the statute if it is reasonable in light of the text, the structure, and the purpose of that enactment. *See id.*

As for *Chevron* step one, we cannot say that the Congress has spoken to the issue and made the hearing fee payable only after the application is formally designated for hearing. Clearly, § 8 itself is silent on the question when the hearing fee must be paid; it requires only that "the Commission shall assess and collect application fees." Nor does the apparent purpose behind § 8—to recapture the costs of regulation—have any implication for what the Congress must have intended with respect to the deadline for paying the hearing fee to cover those costs. Finally, the conference report contains no evidence at all that the Congress intended to preclude the Commission from changing the timing of payment. The relevant fragment is: "2.c. Hearing Charge—The charge levied when an application is designated for hearing." H.R. Conf. Rep. No. 99-453, at 427 (1985). This description appears only in the legislative history, not in the statute itself; moreover, it is but an entry in a list describing 80 different fees being newly imposed by the Congress in the COBRA. We will not, based upon nothing more than this itemization in the conference report, attribute to the Congress a definitive in-

tent upon a subject as to which the statute itself is silent.

With respect to *Chevron* step two, the important feature of the present rule is that it ties the time for payment of the hearing fee to the Commission's acceptance of mutually exclusive applications. That event marks the beginning of a process that will, unless the applicants settle, lead inexorably to a comparative hearing. *See Report & Order,* 6 F.C.C.R. 157, ¶ 6. Considering that the Act directs the Commission to "assess and collect" a fee for such a hearing, we can hardly say it is unreasonable for the Commission to demand payment of the fee when the hearing first becomes necessary, rather than waiting for the formality of the HDO in which the hearing is scheduled and the issues are set out. We conclude that the Commission's current rule on the hearing fee deadline reflects a reasonable interpretation of § 8 of the Communications Act.

## B. The Notice Regulation

Lakeshore also challenges the dismissal of its application as a violation of the Commission's regulation governing the use of unpublished materials, 47 C.F.R. § 0.445(e), which provides:

If [adjudicatory opinions and orders of the Commission, texts adopted by the Commission or a member of its staff, rulemaking documents, and certain formal policy statements and interpretations] are published in the Federal Register, the FCC Record, FCC Reports, or Pike and Fischer Radio Regulation, they may be relied upon, used or cited as precedent by the Commission or private parties in any manner. If they are not so published, they may not be relied upon, used or cited as precedent, except against persons who have actual notice of the document in question or by such persons against the Commission. No person is expected to comply with any

requirement or policy of the Commission unless he has actual notice of that requirement or policy or a document stating it has been published as provided in this paragraph.

According to Lakeshore, the June 11, 1993 fee deadline for its application is a Commission requirement that was not published as provided in the quoted regulation; therefore, Lakeshore, not having had actual notice of the deadline, cannot be required to comply with it.

■ The Commission responds that § 0.445(e) requires publication or actual notice only of the deadline policy, not of every deadline established pursuant to that policy. Because the final rule promulgating the deadline policy was published in the Federal Register, *see* 56 Fed.Reg. 787, 796 (Jan. 9, 1991), § 0.445(e) has been satisfied and the deadline can be enforced against Lakeshore without publication or actual notice of the specific deadline by which it had to pay the hearing fee.

Even without the substantial deference we show to an agency's interpretation of its own regulations, *see Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Jersey Shore Broadcasting Corp. v. FCC,* 37 F.3d 1531, 1536 (D.C.Cir. 1994), we would accept the Commission's interpretation of § 0.445(e) as having been satisfied by publication of the deadline policy in the Federal Register. The regulation on its face authorizes the agency to enforce a published policy, which necessarily leaves to the individual regulatee the burden of knowing that policy and how it applies to that regulatee.*

## C. Due Process: Herein of Personal Notice and of Fair Notice

Lakeshore claims that dismissal of its application on the facts of this case violates its constitutional right to due process. Specifically, Lakeshore claims that the due

---

* Lakeshore does not claim that it did not have "actual notice of ... a document stating [that the deadline rule] has been published as provided in this paragraph." 47 C.F.R. § 0.445(e).

process clause requires the Government to give adequate and effective notice of any proceeding that will adversely affect the property or liberty interest of a party thereto, and that public—as opposed to personal—notice is inadequate where the affected party is known to the Government. *See Mennonite Board of Missions v. Adams*, 462 U.S. 791, 800, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314–15, 70 S.Ct. 652, 94 L.Ed. 865 (1950). Because the Commission knew Lakeshore's identity and knew that its application would be dismissed if it failed to meet the deadline, Lakeshore claims the Commission was required to give it personal notice of the fee deadline.

 Assuming for the sake of the argument that Lakeshore was deprived of a liberty or property interest by dismissal of its application, we hold that public notice was all the process that Lakeshore was due. *See Brenner v. Ebbert*, 398 F.2d 762, 765 (D.C.Cir.1968) (assuming property interest at stake and denying due process challenge because notice was adequate). The premise of Lakeshore's constitutional argument appears to be that it had no notice at all of the payment deadline, but that is not so. Lakeshore "received, or should have received, notice ... in the most obvious way of all: by reading the regulations." *General Electric Co. v. Environmental Protection Agency*, 53 F.3d 1324, 1329 (D.C.Cir.1995). Had Lakeshore simply read the Commission's regulations, it would have known how to determine and satisfy the deadline for paying its hearing fee. The Commission promulgated the 1990 deadline rule more than two years before Lakeshore filed its application. The rule had been the subject of a notice and comment rulemaking, *see Report & Order*, 6 F.C.C.R. 157 (1990), had been published in the Federal Register, *see* 56 Fed.Reg. 787, 796 (Jan. 9, 1991), and had been placed in the Code of Federal Regulations, *see* 47 C.F.R. § 73.3573. The rule unambiguously notified each prospective applicant, including Lakeshore, that the public notice announcing that its application had been accepted for filing "will also announce the date on which all mutually exclusive applicants will be required to pay the hearing fee." *Id.*

The Commission's published regulations also notified prospective applicants how to obtain the public notice: "A limited number of copies of ... public notices of Commission actions [ ] and other public releases [are] made available at the Press and News Media Division when they are issued. Back issues of public releases are available for inspection in this office." *Id.* § 0.422. Finally, the Commission's published regulations notified the prospective applicant that failure to pay the fee in a timely manner would result in the dismissal of its application. *See id.* § 1.1110 (1993), *recodified at id.* § 1.1112.

The Commission's regulations clearly put Lakeshore on notice that once it filed an application it would be required to monitor the Commission's public notices as they were released in the Commission's Washington press office. This is not an unreasonable burden to place upon an applicant. Lakeshore was not required to monitor public notices on a daily basis: The minimum period between the issuance of a public notice and the hearing fee deadline was 60 days, *see id.* § 73.3573(g)(2), and the Commission maintained back issues of public notices for inspection at its Washington office, *see id.* § 0.422. Therefore, Lakeshore could safely have checked the public notices as infrequently as every 45 or 50 days. The Commission also represented at oral argument that at the relevant time all public notices were indexed by applicant name in the FCC Daily Digest, thus further reducing the effort required to monitor the status of one's application. True, the 1990 deadline rule requires an applicant to bear a greater burden of diligence than would a rule that provided for personal notice of the deadline. Lakeshore adduces no principle of due process, however, that precludes

the Commission, by a duly published rule, from transferring this burden to the prospective licensee.

*Mullane* and its progeny, urged upon us by Lakeshore, require no different result. Those cases were concerned with notice to parties who had no reason even to know there was pending a proceeding that could result in deprivation of their property interest. Lakeshore is in a fundamentally different position: as an applicant before the Commission, it had initiated the application process and knew or should have known that its application was subject to dismissal if it failed to abide by the Commission's various regulations for the submission and prosecution of an application. By filing its application, Lakeshore did not become entitled, as a matter of due process, to personal notice of all existing regulatory requirements that might affect its application; rather, the burden was upon Lakeshore to read and to comply with the agency's published regulations.

Upon these facts, notice by publication of the rule, without personal notice of the individual applicant's deadline, is consistent with *Mullane.* Therefore, Lakeshore's claim of inadequate notice reduces to its argument that the Commission's publication of the deadline rule "did not give adequate notice of the substance of its new rules." Although it is unclear whether Lakeshore premises this "fair notice" claim upon the due process clause, *see, e.g., General Electric Co. v. Environmental Protection Agency,* 53 F.3d 1324, 1328 (D.C.Cir.1995), or upon the Administrative Procedures Act, *see, e.g., Satellite Broadcasting Co. v. FCC,* 824 F.2d 1, 3–4 (D.C.Cir.1987), Lakeshore correctly notes that this court has consistently reversed Commission decisions dismissing applications where the Commission failed to provide "full and explicit notice of all prerequisites." *Salzer v. FCC,* 778 F.2d 869, 871–72 (D.C.Cir.1985); *see also McElroy Electronics Corp. v. FCC,* 990 F.2d 1351, 1358 (D.C.Cir.1993); *Satellite Broadcasting,* 824 F.2d at 3–4; *Radio Athens, Inc.*

*(WATH) v. FCC,* 401 F.2d 398, 401 (D.C.Cir.1968). The Commission need not, however, have "made the clearest possible articulation"; it is enough if "based on a 'fair reading' of [the rule, applicants] knew or should have known what the Commission expected of them." *McElroy Electronics,* 990 F.2d at 1358.

Lakeshore claims that the deadline rule fails to provide fair notice that an applicant would not receive a personal notice of the deadline in addition to the public notice. Under the 1987 deadline rule, applicants had received personal notice before the fee deadline, in the form of the HDO. When the Commission first proposed moving the hearing fee deadline forward, it included a provision for personal notice. *See Proposals to Reform the Commission's Comparative Hearing Process to Expedite the Resolution of Cases, Notice of Proposed Rule Making,* 5 F.C.C.R. 4050, ¶ 8 (1990) ("the staff would send the applicants a pre-designation notice.... That notice would establish the date for filing notices of appearance and the hearing fee"). Although the Commission did not in the end adopt that provision, Lakeshore argues that a reasonable applicant would believe the agency would nonetheless continue to provide personal notice in addition to releasing the public notice. Therefore, according to Lakeshore, a reasonable applicant would not be on notice, even if it had read the 1990 deadline rule, that it must "ferret out" the deadline by searching the public notices.

We think that a fair reading of the 1990 deadline rule would put a reasonable applicant on notice that it must monitor the Commission's public notices in order to determine whether and when any hearing fee was due. The 1990 rule makes no mention of additional personal notice, *see* 47 C.F.R. § 73.3573, and the *Report and Order* adopting the final rule chose to announce the deadline in the public notice "as opposed to a date established in a pre-designation letter," *i.e.,* as opposed to the proposed rule upon which Lakeshore seeks

to rely. 6 F.C.C.R. 157, ¶ 6 (1990). In light of the Commission's rejection of the proposed rule and the unambiguous character of the final rule, a reasonable applicant would not sit back and await personal notice. We therefore conclude that the Commission has satisfied its obligation to provide fair notice of what is required of an applicant in order to avoid dismissal for non-payment of its hearing fee.

### D. Lakeshore's Petition for Waiver and Reinstatement

■ Assuming its application was properly dismissed for failure to make timely payment, Lakeshore argues that the Commission abused its discretion when it denied Lakeshore's request for a waiver of the deadline. Proper consideration of a waiver request is particularly important insofar as the Commission regulates through stringent general rules. *See WAIT Radio v. FCC*, 418 F.2d 1153, 1157 (D.C.Cir.1969). To prevail upon this ground, however, Lakeshore must show that the Commission's reason for denying it a waiver of the deadline rule is "so insubstantial as to render that denial an abuse of discretion." *WAIT Radio v. FCC*, 459 F.2d 1203, 1207 (D.C.Cir.1972). This Lakeshore cannot do.

In rejecting Lakeshore's petition for a waiver, the Commission expressly cited Lakeshore's failure to "establish[ ] good cause for waiver of the hearing fee deadline." *In re Application of Lakeshore Broadcasting, Inc.*, 13 . F.C.C.R. 19062 (1998); *see also* Letter from Marilyn McDermett, FCC Associate Managing Director, to George R. Borsari, Jr. and Susan H. Rosenau 2 (Sept. 11, 1995) ("Lakeshore has not advanced any compelling or extraordinary circumstances that would warrant waiver of the hearing fee deadline"). Indeed, Lakeshore's only proffered reason for its failure to pay the hearing fee on time is that public notice of the deadline was inadequate—the very point we have already rejected.

In the alternative, Lakeshore argues that its waiver request was treated differently from those of two similarly situated petitioners, citing *In re Nancy Naleszkiewicz*, 7 F.C.C.R. 1797 (1992), and Letter to Martin W. Hoffman, Esq. (Apr. 23, 1993) (*Martin Hoffman*). To prevail upon a claim of disparate treatment, Lakeshore must demonstrate that the Commission's action was "so inconsistent with its precedent as to constitute arbitrary treatment amounting to an abuse of discretion." *New Orleans Channel 20, Inc. v. FCC*, 830 F.2d 361, 366 (D.C.Cir.1987).

In the challenged order, the Commission distinguished *Nancy Naleszkiewicz* because that case did not involve a waiver of the deadline for payment of a hearing fee; and it distinguished *Martin Hoffman* because that decision was based upon concern that dismissing the application of a Chapter 7 bankruptcy trustee could interfere with federal bankruptcy policy. At the same time, the Commission cited three other cases in which it denied waivers upon facts similar to those of the present case. *See Lakeshore*, 13 F.C.C.R. at 19062 (citing *East Coast Comm. L.P.*, 11 F.C.C.R. 18221 (1996); *Macon County Broadcasting, Inc.*, 8 F.C.C.R. 8669 (1993); *Gerald E. Davis & Joe Ann Dunn*, 9 F.C.C.R. 3016 (1994)).

The Commission's action here does not appear to be at all inconsistent with precedent, let alone "so inconsistent ... as to constitute ... an abuse of discretion." *New Orleans Channel 20*, 830 F.2d at 366. Lakeshore pointed to a single instance in which the Commission waived the hearing fee deadline, and the Commission discussed the factual differences between that case and this, while noting three cases closer on point where it did not waive the rule. To require a waiver on these facts would be to "transform [an] isolated grant[ ] of [waiver] into a rule binding on the agency." *Id.*

### III. Conclusion

When the Commission by rule adopted the practice of announcing the deadline for

an applicant to pay the hearing fee in a public notice released prior to issuance of the HDO, it shifted to the applicant the burden of monitoring the progress of its application in order to keep abreast of procedural milestones. The rule is premised upon a reasonable interpretation of the Commission's authority under the Communications Act to implement the hearing fee program, and the dismissal of an application for failure to comply with the rule neither violates the Commission's own regulations nor denies the applicant due process of law. We therefore reject Lakeshore's challenges to the dismissal of its application. Because Lakeshore has presented no valid justification for its failure to pay by the deadline and has failed to demonstrate that it was treated more harshly than was any similarly situated applicant, we uphold the Commission's denial of Lakeshore's petition to waive the hearing fee deadline. The order of the Commission is therefore

*Affirmed.*